

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00171-CV
_____

FERGUSON BRASWELL FRASER & KUBASTA, P.C. AND SOUMIT ROY,
Appellants

V.

SAF OILFIELD I, LLC AND SAF CAPITAL PARTNERS, LLC, Appellees

---

On Appeal from the 271st District Court
Wise County, Texas
Trial Court No. CV21-06-449

---

Before Sudderth, C.J.; Bassel and Wallach, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

This is an interlocutory appeal from an order denying arbitration in a legal malpractice case.

Appellee SAF Capital Partners, LLC sought legal representation from Appellant Soumit Roy while Roy was practicing law with Appellant Ferguson Braswell Fraser and Kubasta, P.C. (FBFK). SAF Capital, in the course of hiring Roy, signed FBFK's Engagement Agreement, which contained an arbitration provision. Soon thereafter, Roy helped SAF Capital acquire another company—LO Transport—and Roy formed Appellee SAF Oilfield I, LLC for SAF Capital to use for that purpose.

SAF Capital and SAF Oilfield (together, SAF) now sue FBFK and Roy for alleged malpractice and breaches of fiduciary duty committed during and soon after the acquisition transaction. The Engagement Agreement's arbitration provision is extremely broad and covers "[a]ny controversy, dispute or claim arising out of, or in connection with, or in relation to . . . the Engagement of the Firm and legal services rendered by it or any of its owners or employees." Because this arbitration provision covers all of the claims and parties involved in this case, and because neither FBFK nor Roy waived the right to compel arbitration, we will reverse the trial court's order.

## I. Background

In 2016, Roy was practicing law at FBFK when he was hired to provide legal services for SAF Capital. Roy emailed SAF Capital a copy of FBFK's standard Engagement Agreement to formalize the attorney–client relationship.

2

The Engagement Agreement took the form of a letter, and the letter began: "We are delighted that you wish to retain [FBFK] (the 'Firm') to represent you (the 'Client') in connection with your corporate needs." The Engagement Agreement went on to define various logistical details of FBFK's representation, including the right to compel arbitration:

> Any controversy, dispute or claim arising out of, or in connection with, or in relation to the interpretation, performance or breach of this Agreement or the Engagement of the Firm and legal services rendered by it or any of its owners or employees, including but not limited to fee disputes and legal malpractice, shall be finally determined, at the request of either party, by arbitration . . . .

After sending SAF Capital the Engagement Agreement, Roy assisted the company with its purchase of LO Transport from the Oates family. The parties dispute whether Roy's work on this acquisition was performed as an FBFK employee (SAF says yes; FBFK says no) and whether FBFK performed legal work for SAF outside of the Engagement Agreement (SAF says yes; FBFK says no). Whatever the case may be, by late 2016, Roy was assisting with the acquisition,[1] and in January 2017, he registered a new entity—SAF Oilfield—for SAF Capital to use to purchase LO Transport. SAF Oilfield was created as a wholly owned subsidiary of SAF Capital.

Around the same time that Roy formed SAF Oilfield, he "realized that SAF Capital had not returned an executed copy of [the Engagement Agreement]," so he

---

[1]SAF's petition alleged that it hired Roy after it signed a November 2016 letter of intent to purchase LO Transport, but its brief states that Roy drafted the letter of intent.

3

sent SAF Capital another copy with nonsubstantive updates.[2]  SAF Capital's manager signed the Engagement Agreement on the company's behalf and Roy signed on FBFK's behalf.[3]  Within days, SAF Oilfield and the Oates family signed the LO Transport purchase agreement.[4]  And not long thereafter, Roy transitioned into a role as LO Transport's director.

Ultimately, LO Transport went bankrupt due to issues that—according to SAF—Roy should have flagged during his due-diligence research as part of the acquisition transaction.  Additionally, the Oates family sued SAF, Roy, and FBFK for causes of action related to the acquisition, including breach of contract, fraud, and civil conspiracy.[5]

---

[2]Several minor aspects of the letter were changed (such as the date, FBFK's name, SAF Capital's manager's address, and the fact that the manager signed for SAF Capital through another entity—1836 Capital, LLC), but neither the arbitration provision nor the reference to "corporate needs" was altered.

[3]The portion of the Engagement Agreement addressing FBFK's conflict-of-interest database stated that the firm would "index SAF Capital Partners, LLC as the Firm's Client," and it cautioned SAF Capital "that the Firm only represents the Client."  The term "Client" was defined as "you."

[4]SAF Capital's manager returned the Engagement Agreement on February 1, 2017.  The purchase agreement was dated February 3, 2017, but SAF's petition states that it closed the acquisition on February 15, 2017.

[5]*See Anders v. Oates*, No. 02-19-00116-CV, 2020 WL 1809654, at *1–7 (Tex. App.—Fort Worth Apr. 9, 2020, no pet.) (mem. op.) (resolving anti-SLAPP appeal in related litigation).

4

In August 2018, while the Oates litigation was pending, SAF notified FBFK and Roy of potential malpractice claims related to the acquisition. Over the next two years, the parties repeatedly attended mediation and entered into a series of ten tolling agreements.

Then, in June 2021, SAF sued FBFK and Roy for (1) legal malpractice and (2) Roy's breaches of fiduciary duty both at FBFK and as LO Transport's director. In its petition, SAF alleged that it "engaged Defendants as their legal counsel for matters concerning the acquisition of LO Transport"; that "[i]n all interactions regarding the acquisition, Mr. Roy acted as a shareholder/ partner of FBFK"; that Roy failed to conduct the due-diligence research necessary to ensure that LO Transport was in acceptable financial condition prior to the acquisition; that Roy failed to update the provisions of the final purchase agreement; and that after the acquisition, Roy—while serving as LO Transport's director "in the course and scope of his employment as partner with FBFK"—used LO Transport's finances for improper purposes.

About two months into the lawsuit, FBFK and Roy moved to transfer venue. The trial court denied the motions in December 2021. A few weeks after the denial, Roy moved to compel arbitration, and in April 2022, FBFK joined in Roy's motion. The trial court denied the arbitration motions without specifying the basis for its ruling.

## II. Standard of Review

We review a trial court's order denying a motion to compel arbitration for an abuse of discretion, deferring to the trial court's factual determinations if they are supported by the record. *In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 643 (Tex. 2009) (orig. proceeding). But we review de novo the trial court's legal determinations, including whether the scope of the agreement encompassed the plaintiff's claims and whether a nonsignatory could compel or be compelled to arbitrate. *Id.*; *J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 227 (Tex. 2003); *Leland Pennington, Inc. v. Bulls*, No. 02-20-00282-CV, 2021 WL 832690, at *2 (Tex. App.—Fort Worth Mar. 4, 2021, no pet.) (mem. op.). If a party seeking to compel arbitration establishes the existence of a valid arbitration agreement that encompasses the parties and claims at issue, the trial court has no discretion to deny the motion to compel unless the opposing party proves a defense to arbitration. *In re FirstMerit Bank, N.A.,* 52 S.W.3d 749, 753–54 (Tex. 2001) (orig. proceeding); *see J.M. Davidson,* 128 S.W.3d at 227.

One such defense is waiver. *See Perry Homes v. Cull*, 258 S.W.3d 580, 589–90 (Tex. 2008). Whether a party's litigation conduct implicitly waives its right to compel arbitration is a question of law, which again, we review de novo. *In re Serv. Corp. Int'l*, 85 S.W.3d 171, 174 (Tex. 2002) (orig. proceeding); *In re Bruce Terminix Co.*, 988 S.W.2d 702, 703–04 (Tex. 1998) (orig. proceeding).

When, as here, the trial court does not specify the basis for its order denying arbitration, we must uphold the trial court's ruling if it is supported by any legal ground asserted below. *Leland Pennington*, 2021 WL 832690, at *5.

### III.  Discussion

SAF presented the trial court with four legal grounds to fully or partially deny arbitration:  (1) that SAF's claims did not fall within the scope of the arbitration provision, (2) that nonsignatory SAF Oilfield was not subject to the arbitration provision, (3) that nonsignatory Roy was not entitled to enforce the arbitration provision, and (4) that FBFK and Roy waived their right to compel arbitration. FBFK and Roy challenge these four legal grounds on appeal, and we agree with them on all four.

### A.    SAF's claims fall within the scope of the arbitration agreement.

First, SAF urged the trial court to deny arbitration because it claimed the acquisition transaction was outside the scope of the Engagement Agreement and thus outside the scope of the arbitration provision.  According to SAF, the Engagement Agreement encompassed only SAF's "corporate needs"—not SAF's acquisition transaction.  Plus, SAF adds, FBFK cannot claim that the Engagement Agreement's arbitration provision encompassed the acquisition because FBFK itself has previously argued—in this case and in the Oates litigation—that the LO Transport acquisition was outside the scope of its representation.  And Roy has similarly stated that his work as LO Transport's director was "outside of FBFK," thereby admitting that the

7

post-acquisition fiduciary-duty claims fall outside the scope of the Engagement Agreement as well.

These arguments suffer from three fatal flaws.

### 1.     "Corporate needs" vs. corporate acquisition

First, we disagree with SAF that the language of the Engagement Agreement necessarily precludes its extension to the acquisition transaction. Even if we assume that the Engagement Agreement's reference to "corporate needs" placed a contractual limitation on the scope of representation covered by the Agreement—despite the reference coming as part of a seemingly innocuous introductory statement regarding FBFK's "delight[]" to be retained—the term "corporate needs" is broad enough to encompass a corporate acquisition.

We construe contracts "in light of the usual and ordinary meaning of the contractual language." *United Healthcare of Tex., Inc. v. Low-T Physicians Serv., P.L.L.C.*, No. 02-20-00033-CV, 2021 WL 210846, at *6 (Tex. App.—Fort Worth Jan. 21, 2021, no pet.) (mem. op.) (quoting *IHS Acquisition No. 131, Inc. v. Iturralde*, 387 S.W.3d 785, 794 (Tex. App.—El Paso 2012, no pet.)). And the usual and ordinary meaning of the term "corporate needs" refers to an incorporated entity's "want of something requisite, desirable, or useful." *Need*, Webster's Third New International Dictionary 1512 (1961) (listing as an example usage "a building adequate for the company's [needs]"); *see Corporate*, Webster's Third New International Dictionary 510 (1961) (defining "corporate" as, among other things, "formed into or forming a body by legal

8

enactment" as in "incorporated"). A limited liability company's desire to acquire another entity for a business purpose—or to form a subsidiary to acquire another entity for a business purpose—qualifies as an incorporated entity's "want of something . . . desirable[] or useful." *Need*, Webster's Third New International Dictionary 1512 (1961). Because the term "corporate needs" is unambiguous, "[a]ny consideration of unexpressed intent"—such as a statement from FBFK's corporate representative regarding what legal services FBFK anticipated providing or told Roy not to provide—"[i]s unnecessary and in conflict with contract interpretation principles requiring intent to be determined by an unambiguous contract's plain language."[6] *Wagner v. Apache Corp.*, 627 S.W.3d 277, 285 (Tex. 2021).

### 2. Arbitration provision's scope vs. Engagement Agreement's scope

Moreover, the Engagement Agreement's scope is not determinative. While it is certainly relevant—after all, we must interpret the arbitration provision in the context of the contract as a whole, *J.M. Davidson,* 128 S.W.3d at 229—an arbitration provision may have a broader scope than its surrounding contract.

---

[6]We do not hold that FBFK subjectively contemplated, authorized, or performed all legal services that could meet the definition of "corporate needs." Nor do we comment on the testimony from FBFK's corporate representative that, "at least in [FBFK]," an acquisition "merits its own separate engagement agreement" because it "is a significant time-consuming and relatively expensive transaction" that would most likely need "its own separate security deposit." Rather, we hold that, if FBFK provided legal services for SAF's acquisition transaction, the term "corporate needs" as used in the Engagement Agreement was broad enough to encompass such acquisition-related legal services, absent a contractual amendment or separate agreement to the contrary.

9

For example, in *In re Rubiola*, the Texas Supreme Court held that a broad arbitration provision executed as part of a mortgage financing process encompassed claims related to not just the mortgage but also the condition of the home and the terms of sale. 334 S.W.3d 220, 225–26 (Tex. 2011) (orig. proceeding). There, the homebuyers sued for alleged misrepresentations made by the listing agent, such as promising certain repairs and promising to repurchase the home if the repairs were not satisfactory. *Id.* Although the listing agent's real estate company was distinct from the mortgage company, the individual who had served as the listing agent had also doubled as the homebuyers' mortgage broker in the transaction.[7] *Id.* at 222–23. And as part of the mortgage financing process, the homebuyers executed an arbitration agreement with the mortgage company. *Id.* The arbitration provision encompassed "any and all controversies or claims between the parties of whatever type or manner, including without limitation, all past, present and/or future credit facilities and/or agreements involving the parties." *Id.* at 222, 226. The provision further defined "parties" to include more than just the signatories to the financing agreement—it encompassed the mortgage company's "individual partners, affiliates, officers, directors, employees, agents, and/or representatives of any party to such documents." *Id.* at 222–24. Construing this broad arbitration provision, the court held that it "was not limited to the financing part of the transaction but rather

---

[7]The individual who served as the buyers' listing agent and lender was also the vice president of the mortgage company. *See Rubiola*, 334 S.W.3d at 222.

10

extended to the real estate sales contract and the [homebuyers'] complaints regarding that sale"—even though the mortgage financing agreement was not necessarily as broad. *Id.* at 226.

Here, then, the question is not whether the Engagement Agreement encompassed Roy's work on the acquisition but whether the arbitration provision did. And the arbitration provision was broader than "corporate needs"[8]—it encompassed "[a]ny controversy, dispute or claim arising out of, or in connection with, or in relation to the interpretation, performance or breach of this Agreement or the Engagement of the Firm and legal services rendered by it or any of its owners or employees, including . . . legal malpractice."  "[T]he scope of an arbitration clause that includes all 'disputes,' and not just claims, is very broad and encompasses more than claims 'based solely on rights originating exclusively from the contract.'" *Henry v. Cash Biz, LP*, 551 S.W.3d 111, 115 (Tex. 2018) (quoting *Pinto Tech. Ventures, L.P. v. Sheldon*, 526 S.W.3d 428, 439 (Tex. 2017)); *see Rebellion Energy II, LLC v. Liberty Res. Powder River Operating, LLC*, No. 01-19-00413-CV, 2019 WL 5699742, at *3 (Tex. App.—Houston [1st Dist.] Nov. 5, 2019, no pet.) (mem. op.) ("Broad arbitration provisions are

---

[8]SAF argues that the arbitration provision limits itself to FBFK's "Engagement" and that "Engagement" is defined in the Engagement Agreement as "corporate needs."  But as we have already held, "corporate needs" was broad enough to encompass a corporate acquisition.  Plus, the arbitration provision was not limited to the "Engagement of [FBFK]"—it also encompassed disputes regarding "legal services rendered by [FBFK] or any of its owners or employees, including . . . legal malpractice."

generally those that apply to 'any dispute' or 'all disputes' arising from an agreement."). Given the intentionally broad phrasing used in the Engagement Agreement's arbitration provision, and given that public policy favors the broad construction of arbitration provisions, *see Henry*, 551 S.W.3d at 115–16, we cannot say "with positive assurance that [the] arbitration clause is not susceptible of an interpretation" that would extend its scope beyond that of the Engagement Agreement. *Id.* at 115 (emphasis omitted) (quoting *Prudential Sec. Inc. v. Marshall*, 909 S.W.2d 896, 899 (Tex. 1995) (orig. proceeding)); *see Prudential Sec. Inc.*, 909 S.W.2d at 899 (noting that "[t]he policy in favor of enforcing arbitration agreements is so compelling that a court should not deny arbitration '*unless it can be said with positive assurance* that an arbitration clause is *not* susceptible of an interpretation which would cover the dispute at issue'" (quoting *Neal v. Hardee's Food Sys., Inc.*, 918 F.2d 34, 37 (5th Cir. 1990)); *In re Dillard Dep't Stores, Inc.*, 186 S.W.3d 514, 516 (Tex. 2006) (orig. proceeding) (similar).

### 3. SAF's pleadings vs. FBFK's and Roy's contentions

This brings us to the final flaw in SAF's arguments related to the scope of the arbitration provision. SAF argues (1) because FBFK's corporate representative has testified via deposition that the acquisition was beyond the contemplated scope of FBFK's representation under the Engagement Agreement, FBFK is quasi-estopped from claiming that the Engagement Agreement's arbitration provision applies; and (2) because Roy has testified via deposition that his post-acquisition work as LO

12

Transport's director was "outside of FBFK," he cannot claim that the arbitration provision applies either. As SAF told the trial court, "[t]hey can't now switch horses and all of a sudden decide they have a different position."

But as we have already held, the scope of legal representation contemplated by FBFK or encompassed by the Engagement Agreement may be different from the scope of the arbitration provision, so FBFK's motion to compel arbitration did not "assert[] . . . a right inconsistent with a position previously taken" as was required for quasi-estoppel. *Clark v. Cotten Schmidt, L.L.P.*, 327 S.W.3d 765, 770 (Tex. App.—Fort Worth 2010, no pet.) (stating doctrine of quasi-estoppel). More importantly, whether a claim falls within an arbitration provision's scope is not determined by the defendants' deposition testimony or pleadings. Rather, to determine whether a party's claims fall within an arbitration agreement's scope, we focus on the plaintiff's factual allegations in its petition. *See Rubiola*, 334 S.W.3d at 225; *FirstMerit Bank*, 52 S.W.3d at 754.

SAF's petition alleged that "Plaintiffs [SAF Capital and SAF Oilfield collectively] engaged Defendants [FBFK and Roy collectively] as their legal counsel for matters concerning the acquisition of LO Transport"; that "[i]n all interactions regarding the acquisition, Mr. Roy acted as a shareholder/partner of FBFK"; that "[a]s [legal] clients, Defendants owed Plaintiffs a duty of care"; and that Roy was later "employed . . . as a director after the acquisition of LO Transport" and "undertook this role in the course and scope of his employment as partner with FBFK." These

13

expressly pleaded premises were repeated in various forms throughout SAF's petition, and SAF's malpractice and fiduciary-duty claims reiterated and relied upon them.[9]

SAF's petition thus unambiguously alleged that FBFK's and Roy's work during and soon after the acquisition—the actions which formed the basis for SAF's claims—were part of the "legal services rendered by [FBFK] or [Roy, who was one]

---

[9]In its factual background, SAF asserted that

21.   . . . Plaintiffs engaged Defendants to complete the transaction with LO Transport.

22.   In all interactions regarding the acquisition, Mr. Roy acted as a shareholder/partner of FBFK, transacted business using an FBFK e-mail address, and even held the closing for the acquisition in FBFK's office.

[Indentation altered.]   SAF reiterated these allegations in pleading its acquisition-related legal malpractice and breach of fiduciary duty causes of action.   For each of the two claims, it pleaded that "Plaintiffs engaged Defendants as their legal counsel for matters concerning the acquisition of LO Transport"; that "[b]y virtue of this relationship, Plaintiffs became Defendants' clients"; that "[a]s clients, Defendants owed Plaintiffs a duty of care"; and that, "[b]ecause a law firm is liable for the acts of its partners/shareholders/agents, FBFK is jointly and severally liable for Mr. Roy's breaches to Plaintiffs."   SAF's third and final claim—alleging post-acquisition breach of fiduciary duty—similarly alleged that SAF "employed Mr. Roy as a director after the acquisition of LO Transport"; that "Mr. Roy undertook this role in the course and scope of his employment as partner with FBFK"; and that "[i]n his role of director, Mr. Roy owed [but breached] a fiduciary duty to Plaintiffs."

SAF's petition also listed a fourth claim in which it sought attorney's fees under Chapter 38 of the Texas Civil Practice and Remedies Code, but a request for attorney's fees under Chapter 38 is not a stand-alone cause of action. *See In re Nalle Plastics Fam. Ltd. P'ship*, 406 S.W.3d 168, 172–73 (Tex. 2013) (orig. proceeding) (noting that Chapter 38 allows for the recovery of attorney's fees but the "party must first prevail on the underlying claim and recover damages" (emphasis omitted)).

14

of its owners or employees."[10]  FBFK's defensive contention that it did not represent SAF in the acquisition transaction cannot remove the dispute from the scope of the arbitration provision any more than can FBFK's defensive contention that it did not commit legal malpractice at all.

Because SAF's claims qualified as "controvers[ies], dispute[s] or claims[s] arising out of, or in connection with, or in relation to the . . . legal services rendered by [FBFK] or any of its owners or employees," SAF's claims for malpractice and breach of fiduciary duty were within the scope of the arbitration provision, and the trial court's order denying arbitration cannot be upheld on this basis.

**B.  SAF Oilfield is subject to the arbitration provision.**

SAF also argues, as it did before the trial court, that SAF Oilfield cannot be compelled to arbitrate because it was not a signatory to the Engagement Agreement. Although "[t]he involvement of a non-signatory is an important distinction because a party cannot be forced to arbitrate absent a binding agreement to do so," *Jody James Farms, JV v. Altman Grp., Inc.*, 547 S.W.3d 624, 632 (Tex. 2018), Texas courts have recognized "six scenarios in which arbitration with nonsignatories may be required: incorporation by reference, assumption, agency, alter ego, equitable estoppel, and

---

[10]Although SAF argued in the trial court that, for SAF's post-acquisition fiduciary duty claim, Roy's work "was outside the scope of his work at FBFK," SAF's petition alleged the opposite—that Roy was "employed . . . as a director after the acquisition of LO Transport" and "undertook this role in the course and scope of his employment as partner with FBFK."

third-party beneficiary." *Apache Corp. v. Wagner*, 621 S.W.3d 285, 296 (Tex. App.—Fort Worth 2018) (mem. op.), *aff'd*, 627 S.W.3d 277 (Tex. 2021); *see Jody James Farms*, 547 S.W.3d at 633.

"[A] litigant who sues based on a contract subjects him or herself to the contract's terms." *FirstMerit Bank*, 52 S.W.3d at 755. A nonsignatory's suit is "based on a contract" if the nonsignatory "seeks, through the claim, to derive a direct benefit from the contract containing the arbitration provisions." *In re Weekley Homes, L.P.*, 180 S.W.3d 127, 131 (Tex. 2005) (orig. proceeding) (quoting *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 741 (Tex. 2005) (orig. proceeding)). "But a nonparty may seek or obtain direct benefits from a contract by means other than a lawsuit" as well. *Id.* at 132. "[W]hen a nonparty consistently and knowingly insists that others treat it as a party, it cannot later 'turn[ ] its back on the portions of the contract, such as an arbitration clause, that it finds distasteful.'" *Id.* at 135 (quoting *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 200 (3d Cir. 2001)).

In *Weekley Homes*, for example, the Texas Supreme Court held that a homebuyer's adult daughter could not escape an arbitration clause in the home purchase agreement when the daughter asserted rights and accepted benefits under that agreement. *Id.* at 133–34. The daughter had negotiated the home's construction, she had demanded repairs from the construction company, and she had received reimbursement after her family was forced to move out to make way for the repairs.

*Id.* at 129, 133. When the daughter later sued the construction company for personal injuries arising from the allegedly negligent manner in which the repairs had been completed, the Texas Supreme Court held that the daughter could be compelled to arbitrate. *Id.* at 129, 132–34. Even though she was a nonsignatory to the purchase agreement, she "purport[ed] to make no claim on the Weekley contract," and her claims could have been brought by a bystander based on Weekley's independent duties under Texas law, the court still found that direct-benefits estoppel applied because the daughter had "deliberately sought substantial and direct benefits from the contract, and Weekley [had] agreed to comply." *Id.* at 132–34.

Our sister court later applied this same doctrine to a malpractice case in *Greenberg Traurig, LLP v. Nat'l Am. Ins. Co.* 448 S.W.3d 115, 117–23 (Tex. App.— Houston [14th Dist.] 2014, no pet.). There, the nonsignatory was an insured, and the insurer hired an attorney at Greenberg Traurig to represent the insured in an appeal, but the attorney did not file a timely notice of appeal. *Id.* at 117–18. When the insured sued the attorney and Greenberg Traurig for malpractice, Greenberg Traurig moved to compel arbitration under an arbitration provision in the retainer agreement—a retainer agreement signed by the insurer but not by the insured.[11] *Id.* at

---

[11]The arbitration provision in Greenberg Traurig's retainer agreement expressly stated that the insurer "would be 'speaking for both [itself] and for [the insured]' in the joint representation agreement," and that "[b]y executing this engagement agreement without striking through the arbitration clause above, [the insurer] further warrants and represents . . . [that it] is authorized to execute and bind [the insured] to the arbitration provision above in accordance with any insurance agreements

17

118. The insured argued that it could not be compelled to arbitrate because it was not a signatory to the retainer agreement. *Id.* at 118, 121. The Fourteenth District Court of Appeals rejected this argument, though, based on the doctrine of direct-benefits estoppel. *Id.* at 121–22. Because the insured "insist[ed] that Greenberg violated various duties owed to [the insured] as a client," and because its claims—negligence, malpractice, and breach of fiduciary duty—were all "based on Greenberg's legal representation of [the insured], which ar[o]se[] out of the agreement," the court held that the insured could not "avoid the arbitration provision in the agreement providing for [the insured's] legal representation." *Id.*

The present situation bears many similarities to the circumstances in *Greenberg Traurig*. Here, as there, a nonsignatory client—SAF Oilfield—sued a law firm and an attorney—FBFK and Roy—for alleged violations of attorney–client duties that arose out of SAF Capital's contractual engagement of FBFK. Of course, SAF disputes that the sued-upon duties arose out of the Engagement Agreement, arguing that "nothing prohibit[ed] FBFK from representing SAF Oilfield [separate from SAF Capital and] without a written engagement agreement." Although this is true as a hypothetical possibility, SAF Oilfield failed to plead—much less offer any evidence—that such a

---

governing the [insurer–insured] business relationship." *Greenberg Traurig*, 448 S.W.3d at 118.

separate, unwritten agreement existed.[12]  On the contrary, SAF Oilfield pleaded its

claims jointly with SAF Capital, making no distinction between SAF Capital's

contractual engagement of FBFK and SAF Oilfield's engagement of FBFK.

SAF's petition began by declaring two collective terms for itself—referring to

both SAF Capital and SAF Oilfield as "SAF" or "Plaintiffs"—then it used these

collective terms to plead its claims and supporting factual allegations:

- "Plaintiffs [collectively] engaged Defendants to complete the transaction with LO Transport."

- "Plaintiffs [collectively] assert Count One [for legal malpractice] against FBFK and Roy."

---

[12]SAF hinted at the existence of a separate, unwritten agreement in unsworn motions before the trial court, but the only evidence on the issue came in through FBFK's and Roy's affidavits, in which they indicated that the Engagement Agreement covered all of the legal work that Roy performed for SAF Capital and SAF Oilfield on FBFK's behalf.  *See In re Poly-Am., L.P.*, 262 S.W.3d 337, 354 (Tex. 2008) (orig. proceeding) (holding that, because affidavits were not controverted, the court of appeals could properly credit those facts on appeal); *Jack B. Anglin Co., Inc. v. Tipps*, 842 S.W.2d 266, 269 (Tex. 1992) (orig. proceeding) (stating that a "trial court may summarily decide whether to compel arbitration on the basis of affidavits, pleadings, discovery, and stipulations" unless "the material facts necessary to determine the issue are controverted, by an opposing affidavit or otherwise admissible evidence," in which case "the trial court must conduct an evidentiary hearing"); *Hawk Steel Indus., Inc. v. Stafford*, No. 02-19-00040-CV, 2019 WL 3819506, at *2 (Tex. App.—Fort Worth Aug. 15, 2019, pet. denied) (mem. op.) (analogizing arbitration proceeding to summary judgment, noting that "[t]he same evidentiary standards apply, and the party alleging that an arbitration agreement exists must present summary proof that the dispute is subject to arbitration (through affidavits, pleadings, discovery, or stipulations), and the party resisting arbitration may contest the opponent's proof or present evidence supporting the elements of a defense to enforcement").  SAF did not offer any "opposing affidavit[s] or otherwise admissible evidence" to controvert FBFK's and Roy's affidavits.  *See Jack B. Anglin Co.*, 842 S.W.2d at 269.

- "Plaintiffs [collectively] assert Count Two [for acquisition-related breach of fiduciary duty] against FBFK and Roy."

- "Plaintiffs [collectively] engaged Defendants as their legal counsel for matters concerning the acquisition of LO Transport."

- "By virtue of this relationship, Plaintiffs [collectively] became Defendants' clients."

- "Defendants owed Plaintiffs [collectively] a duty of care."

- "Defendants breached their duty of care to Plaintiffs [collectively] . . . ."

- "Plaintiffs [collectively] assert Count Three [for post-acquisition breach of fiduciary duty] against Defendants."

- "Plaintiffs [collectively] employed Mr. Roy as a director . . . ."

- "Mr. Roy owed a fiduciary duty to Plaintiffs [collectively]."

In short, SAF's "original petition ma[d]e[] no distinction between the [signatories'] claims and the [nonsignatories'] claims." *FirstMerit Bank*, 52 S.W.3d at 755–56. The Texas Supreme Court has held that a nonsignatory to an installment contract was subject to the contract's arbitration provision when the nonsignatory joined the signatories in suing for alleged violations of the installment contract and the "original petition ma[d]e[] no distinction between the [signatories'] claims and the [nonsignatories'] claims." *Id.* Here, SAF merged its signatory claims with its nonsignatory claims, and it sought to recover for attorney–client duties that were established by the Engagement Agreement and covered by that Agreement's arbitration provision. Therefore, SAF Oilfield is subject to the arbitration provision

20

in the Engagement Agreement, and the trial court's order denying arbitration cannot be upheld on this basis.

## C. Roy can enforce the arbitration provision.

SAF also argues that Roy cannot enforce the arbitration provision because Roy was not a party to the Engagement Agreement—he signed it as FBFK's agent but he did not sign for himself in his individual capacity. But Roy is being sued for his actions as an alleged agent of a signatory,[13] and the Engagement Agreement expressly contemplated its application to claims against FBFK's "owners or employees."

### 1. Enforcement as a signatory's agent

"[T]he agents of a signatory may sometimes invoke an arbitration clause even if they themselves are nonsignatories." *In re Kaplan Higher Educ. Corp.*, 235 S.W.3d 206, 209 (Tex. 2007) (orig. proceeding); *see Meyer v. WMCO-GP, LLC*, 211 S.W.3d 302, 305 (Tex. 2006) (noting that "sometimes a person who is not a party to the agreement can compel arbitration with one who is, and vice versa"). When an agreement provides that the substance of a dispute will be arbitrated, a signatory cannot avoid arbitration by suing the agent of the other. *See Kaplan*, 235 S.W.3d at 209–10.

---

[13]SAF contends that Roy failed to preserve his agency argument, but this is not so. After Roy filed his motion to compel arbitration, SAF responded that he could not compel arbitration as a nonsignatory, and Roy replied by arguing that "[a] contracting party generally cannot avoid unfavorable clauses by suing the other party's agents," so "Roy, as a shareholder and/or an employee of FBFK [wa]s entitled to compel Plaintiffs to arbitration under an agency theory.

21

In *In re Kaplan Higher Educ. Corp.*, for example, 45 students each signed an agreement with their vocational college agreeing to arbitrate disputes "arising from or relating to" the students' enrollment agreement. *Id.* at 208. The students, alleging that they had been fraudulently induced to enroll, sued the college, the college's parent corporation, the college's president, and the college's admissions director. *Id.* When the defendants moved for arbitration under the enrollment agreement, the students nonsuited their claims against the two signatories—the college and the college president—while retaining their claims against the nonsignatories. *Id.* The Texas Supreme Court nonetheless held that the nonsignatories were entitled to compel arbitration under the enrollment agreement. *Id.* at 208–10.

The court explained that just as "a contracting party generally cannot avoid unfavorable clauses by suing the other party's agents," so "if two companies sign a contract to arbitrate disputes, one cannot avoid it by recasting a contract dispute as a . . . claim against an owner, officer, agent, or affiliate of the other." *Id.* at 209 (internal citations omitted). Indeed, "almost every contract claim against a corporation could be recast as a . . . claim against the agents or employees who took part in the negotiations preceding it," and "it is impractical to require every corporate agent to sign or be listed in every contract." *Id.* Plus, under the Texas Education Code, the signatory college faced potential liability if the students were successful in their claims against the college's nonsignatory agents, and "[i]f the College's liability

22

for [providing] refunds . . . c[ould] be decided in court by suing its agents, then the arbitration contract [would be] effectively abrogated." *Id.* at 209–10.

The same is true in legal malpractice cases such as the one at hand. Almost any dispute with a law firm over alleged malpractice could be recast as a suit against one or more individual attorneys at the firm. And often, as here, the defendant law firm is threatened with liability based on the alleged malpractice of its employee. SAF cannot avoid arbitration by suing FBFK's nonsignatory agent—Roy—for "claim[s] arising out of . . . legal services [allegedly] rendered by" Roy on FBFK's behalf. Roy can therefore compel arbitration as FBFK's agent.

### 2. Enforcement as contemplated by the Engagement Agreement

Aside from being FBFK's agent, there is another reason why Roy can compel arbitration: because the Engagement Agreement expressly contemplated it.

"[S]ignatories to an arbitration agreement may identify other parties in their agreement who may enforce arbitration as though they signed the agreement themselves." *Rubiola*, 334 S.W.3d at 226 (holding that nonsignatories could compel arbitration where mortgage financing agreement contained broad arbitration clause and defined "parties" to include certain nonsignatories). When SAF assented to the Engagement Agreement, it agreed that it could be compelled to arbitrate certain disputes regarding "legal services rendered by [FBFK] *or any of its owners or employees*" and it agreed that "th[e] [arbitration] provision eliminate[d] [its] right to a jury or other trial in any and all disputes against the Firm *or its owners or employees*." [Emphasis

23

added.]  The Engagement Agreement thus contemplated arbitration in a suit against an FBFK owner or employee even if FBFK was not a party to the litigation.  Such language extended the right to compel arbitration to these expressly contemplated nonsignatories.  *Cf Lucchese Boot Co. v. Rodriguez*, 473 S.W.3d 373, 384 (Tex. App.—El Paso 2015, no pet.) (holding that, because the scope of the arbitration agreement expressly included claims "against the Company or its officers, directors, shareholders, employees, or agents in their personal or official capacities," the company's nonsignatory employees had the right to seek arbitration as third-party beneficiaries).

SAF argues, however, that the arbitration provision stated that it could be invoked "at the request of either party" which, according to SAF, limited its invocation to "part[ies]" to the Engagement Agreement.  But the term "party" was not defined in the Engagement Agreement, and reading that Agreement as a whole reveals that the term "party" was used in multiple senses.  *See J.M. Davidson*, 128 S.W.3d at 229 (reiterating that courts must "consider the entire writing" and that "all the provisions must be considered with reference to the whole instrument").

The Engagement Agreement used the term "party" to refer, for example, to a "party with an interest that may be adverse" to SAF's interests, to a "prevailing party" in arbitration, and to the "parties hereto" the Engagement Agreement.  The last term—"parties hereto"—was the Engagement Agreement's preferred phrase when limiting its reach to the signatories.  The arbitration provision itself demonstrated this distinction between "party" and "parties hereto":

24

> Any [covered] controversy, dispute or claim . . . shall be finally determined, *at the request of either party,* by arbitration . . . . The arbitrator shall award *the prevailing party*, in addition to the costs of the proceeding, *that party's* reasonable attorneys' fees. *The parties hereto* shall be bound by this provision and the results of any such arbitration. *The parties hereto* have the right to consult independent counsel about this . . . Agreement. *The parties hereto* acknowledge and agree that . . . this provision eliminates their right to a jury or other trial in any and all disputes against the Firm or its owners or employees.

[Emphasis added.] Given the multiple senses in which the term "party" was used in the Engagement Agreement, the context of the term "at the request of either party" clarifies its reference to the parties to the "controversy, dispute, or claim"—not the "parties hereto" the Engagement Agreement. Plus, in construing the arbitration provision, we must "give effect to all the provisions of the contract so that none will be rendered meaningless," *id.*, and SAF's interpretation of this provision—limiting the right to compel arbitration to signatories—would render meaningless the references to FBFK's "owners or employees."

In sum, Roy can compel arbitration under the Engagement Agreement's arbitration provision—not only because he was an agent of a signatory who allegedly acted on that signatory's behalf in the arbitrable matters but also because the plain language of the arbitration provision contemplated invocation by a nonsignatory "owner or employee." The trial court's order denying arbitration cannot be upheld on this basis.

**D. Neither FBFK nor Roy waived the right to arbitrate.**

Finally, SAF contends—as it did before the trial court—that FBFK and Roy implicitly waived the right to arbitrate. *Cf. Legoland Discovery Ctr. (Dall.), LLC v. Superior Builders, LLC*, 531 S.W.3d 218, 222 (Tex. App.—Fort Worth 2017, no pet.) ("Waiver of a valid and applicable arbitration agreement may be express or implied."). To prove waiver, SAF points to (1) the three-year delay between when SAF put FBFK and Roy on notice of its claims and the motion to compel arbitration, (2) the parties' numerous pre-suit tolling agreements, (3) the parties' attempted mediations, (4) FBFK's and Roy's participation in discovery, and (5) FBFK's and Roy's motions to transfer venue.[14] None of these actions "substantially invok[ed] the judicial process." *See Perry Homes*, 258 S.W.3d at 589–90.

A party implicitly waives its right to compel arbitration if it "substantially invok[es] the judicial process" through "conduct inconsistent with a claimed right to compel arbitration." *Id.*; *Legoland*, 531 S.W.3d at 222; *see G.T. Leach Builders, LLC v. Sapphire V.P., LP*, 458 S.W.3d 502, 511–12 (Tex. 2015). Whether a party's litigation

---

[14]SAF also argues that FBFK and Roy waived the right to compel arbitration by participating in "protracted litigation" with the Oates family. But SAF does not allege that it was adverse to FBFK in the Oates litigation, nor does it allege that the Engagement Agreement bound the Oates family to arbitrate its disputes with FBFK or Roy. SAF has not otherwise explained how FBFK's or Roy's conduct in the Oates lawsuit allegedly waived the right to compel arbitration in this lawsuit. *Cf. Haddock v. Quinn*, 287 S.W.3d 158, 178–80 (Tex. App.—Fort Worth 2009, pet. denied) (holding conduct in prior lawsuit waived right to arbitration where "both [the] prior suit and [the] arbitration demand assert[ed] the same conduct" as a factual basis).

conduct qualifies as "substantial" is a legal question and is determined on a case-by-case basis from the totality of the circumstances. *Perry Homes*, 258 S.W.3d at 590–91 598; *cf. In re Nationwide Ins. Co. of Am.*, 494 S.W.3d 708, 713 (Tex. 2016) (orig. proceeding). "[K]ey factors include the reason for delay in moving to enforce arbitration, the amount of discovery conducted by the movant, and whether the movant sought disposition on the merits." *Richmont Holdings, Inc. v. Superior Recharge Sys., L.L.C.*, 455 S.W.3d 573, 575 (Tex. 2014).

The party opposing arbitration bears the burden to prove a substantial invocation of the judicial process, and because the law strongly favors arbitration, "this hurdle is a high one." *Perry Homes*, 258 S.W.3d at 589–90; *Legoland*, 531 S.W.3d at 222. It is so high that "appellate courts seldom find an implied waiver through litigation conduct," *Legoland*, 531 S.W.3d at 222, and the Texas Supreme Court has declined to find waiver even when the party seeking arbitration has, among other things, filed suit, moved to dismiss for lack of standing, moved to set aside a default judgment, removed the case to federal court, moved to strike an intervention, opposed discovery, requested an initial round of discovery, noticed and taken as many as four depositions, opposed a trial setting, and agreed to a trial resetting. *Perry Homes*, 258 S.W.3d at 590 (listing circumstances in which the court held that arbitration had not been waived).

Although SAF identifies numerous actions that it claims substantially invoked the judicial process, it contends that we need only consider one: FBFK's and Roy's

27

delay. SAF argues that this three-year delay, standing alone, is sufficient to demonstrate waiver. To support its position, SAF notes that FBFK and Roy received notice of SAF's claims three years before they moved to compel arbitration, and it highlights a footnote in *Perry Homes* in which the Texas Supreme Court cited a First Circuit case holding that a three-year delay constituted waiver. *See id.* at 591 n.58. But a federal First Circuit case cited as an example in a footnote—even a Texas Supreme Court footnote—does not make that federal case binding on this court. And the Texas Supreme Court has reiterated both before and after *Perry Homes* that "mere delay in moving to compel arbitration is not [generally] enough for waiver." *Richmont Holdings*, 455 S.W.3d at 576; *see In re Vesta Ins. Grp.*, 192 S.W.3d 759, 763 (Tex. 2006) (orig. proceeding) (similar); *cf. Nationwide Ins. Co. of Am.*, 494 S.W.3d at 714 (stating similarly while applying waiver standard to forum-selection clause).

Moreover, FBFK and Roy did not delay for three years. SAF measures the delay from the time FBFK and Roy received pre-suit notice of SAF's claims, but our sister courts have held that a defendant is not generally[15] required to make a pre-suit demand for arbitration given that arbitration "may establish its own liability [and], if that party remains inactive, a claim may never be formally pressed in either arbitration or a court proceeding." *USX Corp. v. West*, 759 S.W.2d 764, 768 (Tex. App.—Houston [1st Dist.] 1988, no writ) (noting that "no law . . . requires a party to make a

---

[15]This is not to say that there are never instances in which pre-suit conduct may be inconsistent with the right to arbitrate.

28

pre-suit demand for arbitration that may establish its own liability"); *see Neatherlin Homes, Inc. v. Love*, No. 13-06-328-CV, 2007 WL 700996, at \*9 (Tex. App.—Corpus Christi–Edinburg Mar. 8, 2007, no pet.) (mem. op.) (rejecting argument that defendant waived right to compel arbitration and stating that "[defendant] was under no obligation to assert its right to arbitration before [plaintiff] filed suit"); *Nationwide of Bryan, Inc. v. Dyer*, 969 S.W.2d 518, 521 (Tex. App.—Austin 1998, no pet.) (similar); *cf. Enviro Petroleum, Inc. v. Kondur Petroleum, S.A.*, 91 F. Supp. 2d 1031, 1033 (S.D. Tex. 2000) (order) (finding no waiver and noting that "the most rational course of action for the non-complaining party to take when initially confronted by a dissatisfied claimant is to do nothing and hope that the complaining party is simply 'blowing off steam' and will never actually initiate a lawsuit or commence arbitration proceedings").

Putting aside the pre-suit period of the delay, after SAF filed its lawsuit, the defendants moved to compel arbitration within ten months—Roy moved to compel arbitration in approximately six months, and FBFK joined in the motion a little more than three months later. Texas courts have rejected waiver arguments in cases with far longer delays. *See Richmont Holdings*, 455 S.W.3d at 575–76 (holding that 19-month delay was alone insufficient to establish waiver); *Vesta Ins. Grp.*, 192 S.W.3d at 763 (holding that "litigating for two years in the trial court" was alone insufficient to establish waiver).

29

Plus, FBFK's and Roy's pre-suit conduct was not inconsistent with the right to compel arbitration. *See G.T. Leach Builders*, 458 S.W.3d at 511–12 (noting that, to substantially invoke the judicial process, a party must engage in "conduct inconsistent with a claimed right to compel arbitration"); *Legoland*, 531 S.W.3d at 222 (similar); *cf. Growtech Partners v. Accenture LLP*, 118 F. Supp. 3d 920, 937–39 (S.D. Tex. 2015) (acknowledging that "the Fifth Circuit has not found waiver based solely on presuit communications or conduct," but discussing cases in which the Fifth Circuit "has found waiver based in part on pre[-]suit conduct inconsistent with the right to arbitrate"). SAF relies upon FBFK's and Roy's execution of ten pre-suit tolling agreements and their attendance at pre-suit mediation, but such conduct was not inconsistent with a right to compel arbitration. Tolling agreements—much like scheduling orders—do not waive the right to arbitrate. *Cf. Legoland*, 531 S.W.3d at 223 (holding that agreeing to a scheduling order did not waive right to compel arbitration). Nor does attending mediation or attempting a settlement. *See id.* (noting that "[a]ttempts at settlement . . . are not inconsistent with an inclination to arbitrate and do not preclude the exercise of a right to arbitration" (quoting *Walker v. J.C. Bradford & Co.*, 938 F.2d 575, 578 (5th Cir. 1991)); *Tex. Residential Mortg., L.P. v. Portman*, 152 S.W.3d 861, 863–64 (Tex. App.—Dallas 2005, no pet.) (recognizing that "a party's attempt at settlement or mediation does not invoke the judicial process so as to waive a claim of arbitration" and that "[s]uch attempts are not inconsistent with a desire to arbitrate"); *Nationwide of Bryan*, 969 S.W.2d at 521 (rejecting argument that

30

pre-litigation negotiations waived right to arbitrate and noting that "[p]re-litigation efforts to negotiate can never be viewed as delay; to hold otherwise would undermine any efforts to resolve a dispute short of trial").

The actions that FBFK and Roy took after SAF filed suit—responding to discovery[16] and moving to transfer venue—were arguably closer to waiver, as they reflected participation in the ongoing judicial process. But even then, the participation was neither substantial nor inconsistent with the right to compel arbitration. "Responding to discovery . . . do[es] not amount to waiver." *G.T. Leach Builders*, 458 S.W.3d at 514 (holding that the defendant had not waived arbitration by responding to discovery and noting that the court "ha[s] declined to find waiver even when the movant itself propounded written discovery"); *FW Servs. Inc. v. McDonald*, No. 04-19-00331-CV, 2020 WL 444400, at *3 (Tex. App.—San Antonio Jan. 29, 2020, no pet.) (mem. op.) (similar, quoting *G.T. Leach Builders*). And the Texas Supreme Court has repeatedly "rejected arguments relying on venue challenges to establish waiver [of

_____

[16]SAF argues that FBFK and Roy engaged in "pre- and post-suit discovery," but it only provided the trial court with copies of FBFK's and Roy's responses to discovery requests—it did not offer any copies of discovery allegedly propounded by FBFK or Roy. FBFK represents that it "sought no discovery in this case," and Roy states that he requested only SAF's disclosures. Propounding requests for disclosure is insufficient to demonstrate waiver. *See G.T. Leach Builders*, 458 S.W.3d at 514 (citing cases in which the court "declined to find waiver of the right to arbitrate . . . where the movant made a request for disclosure"); *Legoland*, 531 S.W.3d at 222 (holding defendant had not waived right to compel arbitration when it "sought only routine disclosures under [R]ule 194 from [plaintiff], which [plaintiff] also requested from [defendant]").

arbitration] because such challenges do not relate to the merits of the case." *G.T. Leach Builders*, 458 S.W.3d at 513–14 (holding that motion to transfer venue did not waive arbitration, citing multiple other cases in which the court held similarly, and concluding that the defendant's other procedural actions—including moving to designate responsible third parties, moving for a continuance, and moving to quash depositions—had not waived its right to arbitrate either). FBFK's and Roy's "[m]erely taking part in litigation is not enough" without the substantial invocation of the judicial process. *Vesta Ins. Grp.*, 192 S.W.3d at 763.

Thus, SAF has not carried its burden to demonstrate that FBFK or Roy substantially invoked the judicial process,[17] and the trial court's order denying arbitration cannot be upheld on the basis of waiver.

---

[17]Because we hold that FBFK and Roy did not substantially invoke the judicial process, we need not address the parties' arguments regarding the prejudice requirement and *Morgan v. Sundance, Inc.*, 142 S. Ct. 1708 (2022). *See* Tex. R. App. P. 47.1; *Legoland*, 531 S.W.3d at 223 (similarly declining to address prejudice).

## IV.  Conclusion

Because the trial court's order denying arbitration cannot be upheld on any of the four legal grounds asserted below, we reverse the order and remand the case for further proceedings consistent with this opinion. *See* Tex. R. App. P. 43.2(d); *G.T. Leach Builders*, 458 S.W.3d at 532 (similarly remanding).

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Delivered:  January 26, 2023